Thank you, Anna. Good morning. I'm Franny Forsman, and I'm representing Stephen Seldon. With me is Lawrence Semenza, who is representing Deborah Seldon. We have divided the argument, and Mr. Semenza will argue the sentencing issue, and I will argue and respond to questions on the remainder of the issues. I'm hoping that I can reserve five minutes for a rebuttal and five minutes for Mr. Semenza. The government's case here depended upon, primarily on two things. One, the testimony of Chad Libdahl, an admitted perjurer. And two, a chart that was introduced, which depended upon assumptions that if Dr. Seldon was not purchasing Allergan's product, and Allergan was the entity that started this investigation because it had a monopoly on the Botox product, if he was not using Allergan's product, the assumption made in the chart was that he must have been using Tritox, which was the product that was distributed by Mr. Libdahl. When they searched, even though the indictment alleges that Tritox was being used between October 15th of 03 to September 16th of 05, when the search occurred on June 8th of 05, they found no Tritox. They found no needles with Tritox on them. They had no patients who had come forward and complained about having a product used upon them that was not Botox. They found no physical evidence whatsoever in a very thorough search of the doctor's office that would have proved their case. So the chart was critical. The reason I say that is that the two matters that occurred during the trial, I think that resulted in an extremely unfair proceeding. It was, first, the repeated injection, excuse the pun, the repeated reference by the government to an incident which occurred in Florida that was not the product that was at issue at this trial. The government concedes in its brief that it was not the product, that it was not a product, it was not a product that was an issue that the jury needed to decide. And yet, if you look through pages 28 to 30 of our brief, we have quoted the repeated references by the government to this incident. In opening statement, respirators, patients were on respirators, not the product that was at issue in this trial. In the examination of Agent Shurer, patients were unconscious. Patients were ill. They couldn't speak because they were in comas. Agent Larson, patients were on respirators. The Allergan Salesman, botulism poisoning in Florida. Libdol, the government's argument is that they needed to be able to refer to these incidents in Florida because they needed to explain to the jury why they got a search warrant. Well, first of all, why they got a search warrant was not at issue in this trial whatsoever. It is not like the case in which a fellow is arrested for felon in possession when he's in the middle of a burglary. This is not that case. They didn't need to talk about why they got the search warrant. But they're asking Chad Libdol why the government got a search warrant in order to be able to, again, refer to the Florida incident. I'm sorry, is this the 403? This is the 403 argument. When was this objected to? Well, let me talk about that because that's important. The government says that it's plain error because there was no objection. If the purpose of the plain error doctrine is that the trial court has not had an opportunity to rule on the question, the trial court ruled on it twice. Let me first point out that neither Mr. Simenson or I were the trial attorneys here. Is it the most artful objection? No, but let me tell you where it comes up. On the transcript day five, this is referenced in page 15 of our reply brief, Mrs. Selden's lawyer stood up and said, wait a minute, that transaction in Florida had nothing at all to do with, and the court cut the lawyer off, or I'm sorry, the prosecutor cut the lawyer off and said, it had everything to do with how their practice got searched in the first place. That's trial day five, page 1097. Again, the complaint is repeated at trial day five, page 1099. Your Honor, the Florida transaction did not involve the substance from Tritox. The court's ruling was that the jury already knew that the substance involved in the Florida incident was not Tritox. Despite that ruling, the government then got up in closing argument and said, and I think it's important to use their exact language, despite that ruling, and despite their conception of it. I'm sorry. What's the ruling? The court said, the court responded that the jury already knew that the substance involved in the Florida incident was not Tritox. Well, if anything, that sounds like a ruling that the evidence could come in because the jury was all aware of it, because it hadn't been previously objected to. That doesn't sound like a ruling that it's improper. So I don't understand why it would be improper for the government to refer to it in closing. The court didn't rule that it was improper. The court ruled that it could come in. And the court said it could come in because I'm letting it in. At one point, the court referenced I'm letting it in for background. And the government argued we need to be able to demonstrate to the jury why we got the search warrant. And the court said, yes, you can do that because the jury already knows that it's not Tritox. But that's not how it was argued in closing argument. How it was argued in closing argument is November 29, 2004, Miami, Florida. It hits the national news. And on this date, Dr. McComb injects himself, his wife, and two others with a botulism toxin type A, which is the same substance the jury has heard about for the last several days. And they are all four in comas. None of the four can talk to law enforcement. They are on respirators. And he's or she is talking about a substance that is not the subject of this trial. Again, again in final argument, and this is after these people were on respirators in Florida, and they're talking about Dr. Selden's instruction to an employee in his office. They're not saying that Dr. Selden is saying this is the same stuff, and therefore they're basically saying injecting into this proceeding respirators, comas, illnesses. Kagan. Was there an objection to that? There was not an objection during closing argument. There was not. But the court had already said twice they can talk about it. The court had already told them twice. We've told the jury it's not Tritox, but I'm letting it in. But it got worse. And the reason it got worse in this case, which is so dependent upon both Libdol's testimony and the chart, is then when Dr. Selden attempted to talk about the checks. This is very garbled. It is difficult to follow because the court made rulings with regard to what he could say about the checks in about three different ways. Probably the best place to look, I think, to see what was happening with the checks is at ER 622 and 623. Steven Selden's lawyer has him up on the stand. The checks are in evidence. Checks have already the checks from the business. They seized all the business records, all the data, all the patient files, and they have all the checks from the business in evidence. They've been stipulated in evidence. He didn't sign the checks, though. He did not sign the checks. They're primarily signed by his wife. They're business checks. They're checks on the account for the business. But they're already in. Okay? And so the lawyer attempts to have Dr. Selden talk about, let me look at this check. And I'll point to you. They're signed by Deborah Selden. This is the court. Let me back up a little bit. The prosecutor objects to the checks saying that they're hearsay, okay, because they're written on the business. And the other argument of the government was that they're not business records because they were received by Dr. Selden in discovery. And accordingly, they're not business records. I'm sorry. That's lost on me. I'm not sure what that objection means. If they're not business records just because the government had them and gave them to Dr. Selden. But nevertheless, so the court says you're not going to talk about the checks. They're signed by Deborah Selden, and the truth of what they were would rest in her testimony. And there are a lot of them here that don't have anything to do with Botox. And the lawyer responds, I was going to have him we're not going to be contending that all the checks are for Botox purposes. I was going to have him identify which ones were. And it's a corporation, and he can testify that they were authorized to write these checks. You don't have to have the person that signed the check talk about the check. The court responds at page ER623, he can testify to that without getting the checks admitted. The checks are already in. You can certainly question him about authorization. Goes back in, tries to talk about a check for $750 and to tell the jury that that's for Botox. And the prosecutor objects, hearsay. And the court rules it's hearsay because there's nothing marked in the memo. The problem with treating what the court really did was to take away from the jury the ability to assess Dr. Selden's identification of the check. Dr. Selden's description of the check as checks that were being used for Botox. This was his whole theory, was that the chart that the government introduced, which was very powerful, that the chart that the government introduced was based upon a faulty assumption. Because it was based upon the assumption that if he wasn't purchasing Botox directly from the manufacturer, from an authorized representative, that therefore whenever the patient records reflected that there was a procedure that would require the toxin, that it must have been this unregulated substance. Who were the payees on the checks that allegedly went to purchase Botox? They were, it was cash. Some of them were cash. That was a problem, I think, the court found, that they were for cash. And I think that's a perfectly permissible area for cross-examination, that the prosecutor then could have cross-examined Dr. Selden as much as they wanted to with regard to what are your records. The guy's a doctor. He doesn't know, you know, he's going to have some, you know, he's not going to be able to sit down and say what each check was for or to whom. But the jury is entitled to be able to assess his credibility in that regard. He was left, after this exchange with regard to those checks, the jury was undoubtedly left with the impression that he had no corroboration for his testimony that he purchased Botox from other sources at all. Who did Dr. Selden testify that he purchased the Botox from? Well, he wasn't permitted to go any farther. I mean, he talked about he would purchase it from other doctors, from other skin care clinics. We know that he for sure did that anyway because the government concedes that he purchased a large amount of Botox substance from one of his own patients. So it went because he had credit problems. He was unable to purchase the stuff directly from the manufacturer. And so then, therefore, he was going to other sources. Apparently, there is no problem with doctors purchasing substances from other doctors or other clinics. Or in this case, because then there were also a couple of distributors. There's a woman by the name of Ginny Yoon. The government concedes that he did purchase substance from her. It was the checks in which there wasn't either something in the memo. This is where the Court was having the problem. How much time are you going to leave your co-counsel? Oh, I'm going down. I need to leave some time for the yes. And I would just like to say that there is a serious, serious search issue here. And if the Court has further questions for me on that, I will be happy to answer those. Thank you. Lawrence Semenza, appearing on behalf of Deborah Selden. If the Court does nothing else but reverse this conviction on the grounds that have been set forth by Ms. Forsman, what needs to be done here is that both of the defendants need to be resentenced. The District Court here abdicated its responsibility by saying that the jury had made the determination as to the amount of loss, which approximately was $140-some-thousand, that the jury also came to a conclusion as to the number of victims. Neither of these things occurred. The jury was not given specific instructions to return. A special interrogatory as to whether or not they found the amount of loss, the number of victims, or whether or not the substance in this particular instance was or posed the conscious risk of serious bodily injury or death. What was the defense at trial? The defense at trial was that the couple of defenses. One, that they had not purchased the substance Tritox, had not utilized the substance on these patients that had the Botox. That this was a clinic and had a good reputation in the past of providing medical services. And what had occurred here was, as Ms. Forsman pointed out, because of credit concerns and all, they were unable to purchase from Allergan, so they purchased the Botox from other places, and that this was not the substance that Mr. Lindahl had testified that he had sold to Dr. and Mrs. Seller. Thank you. Good morning. Adam Flake, the United States. With respect to the Florida incident, I would first like to point out that the objection, the so-called objection occurred on the fifth day of trial, during a sidebar that was being held with regard to an objection raised by the government. So the defense never actually raised an objection to any question, and I would submit that under Federal Rule of Evidence 102, it requires objections to be timely and specific. An objection that takes place on the fifth day of trial, after the Florida incident had been mentioned several times at trial, that didn't actually talk, and the objection didn't talk about Rule 403 either. The objection just said, well, this was a different incident. I would submit that that objection was not sufficient to give the district court an opportunity to make a Rule 403 ruling about the admissibility of evidence of the Florida incident. Did you try the case? I did not, Your Honor. I would also point out to an inaccuracy in the reply brief. It says that in the reply brief they argue that Dr. Selden was not, there was no evidence that Dr. Selden was aware of the Florida incident. That's simply incorrect. There was testimony presented at trial by a man named James Bundy, who, and this is at 264 through 266 of the supplemental excerpts of record, that he was discussing Botox with Dr. Selden, and Dr. Selden said, and he said that they didn't, he was, I believe I initiated the conversation, this is Bundy talking, I believe I initiated the conversation because we were doing Botox, and I just happened to hear it, I think, on the news about the case in Florida. So I was asking him about that. What did he say? Answer, they said they didn't reconstitute it correctly and they didn't know what they were doing. So he was aware of the Florida incident, and Debbie Selden certainly was aware of it. She discussed it with Chad Linville. With regard to the checks that Dr. Selden was not allowed to testify about, the defense is, of course, correct. The checks were in evidence. Dr. Selden was allowed to testify that he wrote checks, that they purchased Botox from other testimony, from other sources. He was allowed to give this testimony. The thing that he was not allowed to do was to point to a check that he didn't write, that didn't say anything about Botox, and that he didn't know, he couldn't say that he knew that that check went to purchase Botox. That's what the district court found. On SER 654, the court, no, no, he's going to have to show personal knowledge of what the money went for, some indication that he was involved in the discussion with respect to the specific check. And I would submit, as we did in our brief, of course, that the court was well within his discretion under Rule 602, which requires personal knowledge. Before testimony may be given, the witness has to show that he has personal knowledge of the testimony that he is about to give. If Dr. Selden had said that check went to purchase Botox, and he couldn't show personal knowledge, the district court did not abuse its discretion in prohibiting this evidence from coming in. Did any of the folks that were alleged to have sold Botox to Dr. Selden testify? That is, the patients, the other clinics, or other doctors that were alleged to have received cash payments in exchange for Botox? I don't believe so, Your Honor. I'm not 100 percent sure, but I don't believe there was any testimony that Was there any ruling that such people would not have been allowed to testify? Not that I'm aware of, Your Honor. I would like to, if the court would like me to, I'd like to address the search warrant. The defense characterizes the warrant here as a general warrant that the government was simply seeking a license to go in and rummage and find whatever they could find, and I believe that that characterization is not accurate. The warrant in this case was carefully drawn. It specified four areas of four types of evidence that they were seeking. It talked about the agent, of course, didn't know what kind of computers the Seldens were using, didn't know what their computer, what they looked like, but he said he generally believed that computers, that businesses of this sort used computers. He laid out carefully a procedure by which computer personnel would go in and make an initial assessment of how they could, whether they needed to copy, whether they needed to, you know, whether they could copy the computers or whether they needed to seize them. And there's some question in this case about the defense claims that the agents didn't follow that procedure, but I would point out that they didn't. The defense did not challenge the manner in which the warrant was executed in the district court, and so we didn't have an opportunity to present detailed evidence about that. I would also point out that the defense claims that Agent Timko, the agent who did the computer person, the computer personnel described by the warrant was Agent Timko. They claimed that the first thing he did was just go in and copy everything. They specifically say in footnote 2 of their brief on page 7 that he copied, that he imaged all of the computers and he imaged the server. That's not correct. On page 614 of the S.E.R., Agent Timko actually testified that he did not image the server. He imaged the computers. He copied some documents off of the server. He copied documents off of the server. But his testimony, which was on another, which was given for a different reason, was given to lay foundation for the documents. But his testimony, the point of it was to, excuse me, the point of it was to lay foundation for the documents, but even that out-of-context testimony does not support the defense's claim that they just went in and copied everything willy-nilly without any regard for the procedures that were laid out in the warrant. Was anything introduced into evidence that was outside the scope of the search warrant? No, Your Honor. So even if the item seized exceeded the scope of the search warrant, isn't part of your argument that that doesn't matter because there's nothing to suppress here because it wasn't used? Yes, Your Honor. That's certainly part of our argument. In addition, and certainly going forward with that, certainly we would argue that the agents acted in good faith as well. If the warrant was defective in some way, shape, or form, this warrant came out before the Hill case was decided, before CDT was decided. So any sort of technical defect that arises based on subsequent case law, the agents certainly acted in good faith in the way they sought the warrant in this case. Any further questions? Thank you. The appellate has some time if you wish to use some of it for rebuttal. Thank you, Your Honor. Let me start with the search warrant. I believe that Judge Gonzales, you may be referring to the result that occurred in Temura, which was long before CDT. Right. The problem in Temura was, or the difference with Temura, is that in Temura there was no challenge to the validity of the warrant itself. We're at this juncture between computerized data and hard data. If this warrant had said what this warrant really meant, which was you can go in there, and if it's going to take you too long to go through every filing cabinet full of patients' records, if it's going to take you too long to do that, you can go ahead and take all the patient files, you can go ahead and take all of the files of the business, you can take everything back to your office, and then you can search through it all and find out what you want from that. This is a challenge, a facial challenge to the warrant. We've cited the cases in our brief in which a full-blown facial challenge to the warrant requires full suppression of all of the evidence. It is of great concern to me, frankly, that not even were the protections that were given in SDI by Judge Pro in which we said, well, at least could we please protect the medical information in the files. That didn't happen here. What the agents were allowed to do was to go into the office, and if it was going to take them too much time to go through the computers, they imaged all of the hard drives. Frankly, I'm not so certain what the difference between that is and the server, but they imaged every single hard drive, every bit and byte. I sort of know what that is. It sounds like everything to me. Took it back to the office, made a copy of it. Don't know whether that's ever even been given back, or the patients whose records were in it. This practice was not just a Botox practice. This isn't like a laptop, which is an instrumentality of a crime. This isn't like a business that is so infused with fraud that you're able to look at everything. This was a medical practice. Botox, as Dr. Selden testified to, was a small part of this practice. There were patients' names thrown around that courtroom who I'm sure didn't know that they were being talked about as having had a medical and an aesthetic procedure to their faces, because when this warrant was issued, basically those agents were told, you can get everything. I'll guarantee you, if this was a lawyer's office, if this was my office, issuing a warrant that says, if it's going to take you too much time to go through the files, you can just go copy all of the computers in my office, regardless of what may be on there, we would all have a problem with that. We have gotten sort of led off with the pornography cases, frankly, and the many pornography cases that hit our offices and hit this court, in which it is difficult to do this. Tamura told them what to do. Tamura told them, told the court, told the agents, this is a boilerplate warrant. What was in this warrant was a boilerplate. We're going to get some computers, and if you have some computers, and it's going to have a bunch of stuff in it, it's all going to be intermingled, and so, therefore, if it's going to take you too much time, take it back to the office. Boilerplate language. No protections for the patients, and no protocol. And that's the important thing. There was no protocol here as is laid out by the ALI procedures that are in Tamura. This is what you should do. Freeze it, image it, come back to the court, and get a protocol to ensure that there is some protection of the privacy rights in this medical practice. So it's a general, full-out challenge to the facial validity of the warrant if you feel that the warrant is too broad and all of the evidence must be suppressed. Thank you, Your Honor. Thank you. Thank you. The Court appreciates hearing from the Federal Defender. From time to time, you might tell that to your fellow Federal Defenders. Thank you. The case just argued is submitted for decision, and that concludes the Court's calendar for this morning. The Court stands adjourned. All rise.
judges: Gonzalez, Schroeder, Bybee